[No. 5151–1.   Division One.   October 16, 1978.]

WORLD WIDE LEASE, INC., *Plaintiff,* v. JAMES S.
GROBSCHMIT, ET AL, *Appellants,* TYLER
RECO, *Respondent.*

538

*T. Reinhard G. Wolff,* for appellants.

*Adair, Kasperson, Petersen & Hennessey, Raymond J. Petersen,* and *David A. Webber,* for respondent.

DORE, J.—Plaintiff World Wide Lease, Inc., sued the defendants for past due lease payments for an automatic ice vending machine. The defendant cross–complained against Tyler Reco, d/b/a Refrigeration Engineers, alleging breach of express and implied warranties claiming the machine was defective. The trial court awarded plaintiff judgment for unpaid lease payments in the amount of $10,000. Defendants were awarded judgment on their cross complaint against Tyler Reco in the amount of $4,241.44. Cross complainants appeal, claiming the amount of the judgment against Tyler Reco should have been in an amount equal to the plaintiff's judgment.

We reverse the judgment against Tyler Reco in its entirety.

ISSUES

1. Whether there was an implied warranty of fitness for a particular purpose, which ran from Tyler Reco, the seller of the ice machine, through the lessor World Wide Lease, Inc., to the lessee Grobschmit.

2. Did the lessee Grobschmit, by signing the equipment acceptance notice waiving all expressed and implied warranties as to the lessor World Wide Lease, Inc., waive all such warranties as to the seller Tyler Reco?

3. Could the lessee Grobschmit, 8 months subsequent to accepting the ice vending machine, revoke such acceptance?

FACTS

Defendants Grobschmit owned and operated a supermarket known as La Conner Food Center in La Conner, Washington. They decided to acquire an automatic ice vending machine. A contract was prepared for the purchase of such machine from Tyler Reco on terms which specifically excluded warranties of merchantability or fitness for a particular purpose. This sale was never consummated. Grobschmit later decided that the vending machine would be leased from plaintiff in order to retain the defendants' capital for purchase of other refrigeration equipment.

An ice vending machine was then sold by Tyler Reco to World Wide Lease, Inc., the lessor, to facilitate leasing to Grobschmit. Thereafter, defendants executed a personal property lease for the ice vending machine. The terms of the lease included the following statement in prominent contrasting type on the face of the lease document:

3. THE EQUIPMENT IS SATISFACTORY IN EVERY WAY, ACCEPTED BY LESSEE AND APPROVED FOR PAYMENT BY LESSOR. LESSEE HEREBY AGREES THAT IT HAS FULLY INSPECTED THE PROPERTY LEASED HEREUNDER AND ACKNOWLEDGES IT TO BE IN GOOD CONDITION AND TO ITS COMPLETE SATISFACTION. LESSEE UNDERSTANDS THAT LESSOR MAKES NO WARRANTIES, EITHER EXPRESSED OR IMPLIED, AS TO THE CONDITION OF THE PROPERTY, OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.

The machine was then installed in defendants' supermarket on July 26, 1974. From the time the machine was installed until the time of trial, the ice machine failed to perform as intended. Difficulties of the machine included repairs necessitated by vandalism, a recalcitrant coin changer, and difficulties with the conveyor mechanism. Nevertheless, the trial court found the machine did function in its refrigeration and storage capacities 100 percent of the time and 75 percent of the time as an automatic vendor. In summary, the court found it was 80 percent effective in use by the defendants.

Grobschmit was advised by representatives of both World Wide Lease, Inc., and Tyler Reco *not* to accept the

machine or to execute the equipment acceptance notice until he was satisfied with the performance of the machine. Substantial repairs were undertaken at no cost to Grobschmit, and after an additional period of observation, defendants executed an equipment acceptance notice on February 17, 1975. The equipment acceptance notice expressly acknowledged that the lease equipment had been delivered and received as follows:

> [T]hat said chattels have been examined and/or tested and *are in good operating order and condition,* and are in all respects satisfactory to undersigned and as represented, and that said chattels have been accepted by undersigned for purposes of said Equipment Lease. We understand that you, as lessor, *make no warranties, either express or implied, as to the condition of the property, or its fitness for any particular purpose.*

(Italics ours.) The acceptance further stated in prominent contrasting type of even larger size than the rest of the notice:

> PLEASE DATE THIS LETTER ON THE DATE YOU ACCEPT THE EQUIPMENT YOU ARE LEASING. DO NOT EXECUTE THIS FORM UNTIL YOU HAVE POSSESSION OF THE EQUIPMENT AND IT IS SATISFACTORY TO YOU.

In August 1975, defendants revoked their acceptance of the machine.

## DECISION

ISSUE 1. We must first determine whether or not the seller Tyler Reco was legally responsible for an implied warranty of fitness for a particular purpose to the lessee. The undisputed testimony established that the agent for Tyler Reco, Bud Turner, who incidentally was a friend of Grobschmit, undertook to sell Grobschmit all of his refrigeration needs for the La Conner Food Center. He recommended to Grobschmit that he purchase the subject machine to meet the competition.

In order for a plaintiff buyer to recover on an implied warranty of fitness for a particular purpose, three

elements are necessary: (1) The seller must have reason to know the buyer's particular purpose;[1] (2) the seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer must in fact rely upon the seller's skill or judgment.

The refrigeration unit was sold by Tyler Reco to the plaintiff for the same price it originally had offered to sell the machine to Grobschmit. In finding that Tyler Reco owed a warranty of fitness for a particular purpose to the lessee Grobschmit, the court in its oral opinion stated:

> I find that in the relationships of the parties this was not anything other than a device, a financing tool whereby Mr. Grobschmit acquired the use of this machine. When World Wide Lease purchased that machine they, for all practical purposes, did so on behalf of and as agent for Mr. Grobschmit. They didn't make the selection of the machine. They didn't negotiate price; they had nothing to do with the prior negotiations, and that was a purchase by World Wide Lease on behalf of Mr. Grobschmit, and in accordance with the lease or submitted by Tyler Reco. Any warranties, any obligations that Tyler Reco had ran right through World Wide Lease and did in fact inure to the benefit of Mr. Grobschmit. Mr. Grobschmit's transactions and dealings with World Wide Lease were entirely independent of his dealings with Tyler Reco. World Wide Lease on its own made no warranties, and I don't think that it is claimed that they did so by Mr. Grobschmit.

The trial court then entered findings of fact and conclusions of law consistent with this opinion.

Finding of fact No. 6:

> At the request of defendant, GROBSCHMIT, WORLD WIDE LEASE, INC., issued its purchase order to TYLER RECO, requesting the purchase of the above referred to ice vending machine. The machine was installed in July or August of 1974.

---

[1] Court applied the warranty of fitness for a particular purpose to lessees of chattels. *W.E. Johnson Equip. Co. v. United Airlines,* 238 So. 2d 98 (Fla. 1970).

Finding of fact No. 7:

The equipment to be purchased by WORLD WIDE LEASE, INC., and in turn leased to the defendants, GROBSCHMIT, was selected by the defendants, GROBSCHMIT, and WORLD WIDE LEASE, INC., did not participate in the selection process.

Finding of fact No. 9:

Notwithstanding the language contained in any agreements between TYLER RECO and GROBSCHMIT, there exists between TYLER RECO and GROBSCHMIT an implied warranty of fitness for intended purpose of the above described machine. Such machine did not conform and therefore, TYLER RECO breached the above warranty, which warranty was for the benefit of GROBSCHMIT. The total purchase price paid to TYLER RECO was the sum of $5,790.00.

Conclusion of law No. 3:

Irrespective of any language in the sales documents of TYLER RECO, the ice vending machine made an implied warranty of fitness for purpose, which implied warranty ran to the defendants, GROBSCHMIT. Any warranties made to WORLD WIDE LEASE, INC., by TYLER RECO, would run through WORLD WIDE LEASE, INC., to the Defendants, GROBSCHMIT, in that TYLER RECO was aware that the ultimate user of said property was GROBSCHMIT.

An examination of the record indicates there is substantial evidence to uphold the court's findings and conclusions that Tyler Reco owed Grobschmit an implied warranty of fitness for a particular purpose. The trial judge emphasized that even though Bud Turner was a personal friend of Grobschmit, that he believed his testimony, and that as agent for Tyler Reco he had selected the particular ice vending machine specifically to compete with a competitor of Grobschmit and that Grobschmit had relied on his representations. We agree with the trial judge that the leasing agreement between World Wide Lease, Inc., and Grobschmit was merely a financing tool whereby Grobschmit acquired the use of the machine. This is strengthened by the fact that Tyler Reco ultimately sold the machine to the

leasing company for the exact price they had agreed to sell the machine to Grobschmit.

We hold that World Wide Lease, Inc., was the agent for Grobschmit in purchasing the machine from Tyler Reco. We also find that Tyler Reco owed defendants an implied warranty of fitness for a particular purpose and that such warranty was breached.

ISSUES 2 and 3: The equipment acceptance notice signed by Grobschmit provided as follows:

EQUIPMENT ACCEPTANCE NOTICE
WORLD WIDE LEASE, INC.
P.O. Box 2398
Lynnwood, WA 98036

Gentlemen:

Refrigeration Engineering Co. (Supplier) has presented invoice No. 6723, dated July 30, 1974 to be part of Equipment Lease No. 2SE–4135, dated 2/14/75.

THIS IS TO CONFIRM TO YOU that pursuant to paragraph three (3) of the lease, the property which is described in the lease between you, as the Lessor, and the undersigned as the Lessee, has been delivered to and received by the undersigned; that all installation or other work necessary prior to the use thereof has been completed; that said property has been examined and/or tested and is in good operating order and condition and is in all respects, satisfactory to the undersigned and as represented by the supplier, and that said property has been accepted by the undersigned for purposes of the equipment lease.

We understand that you, as Lessor, make no representations or warranties either expressed or implied as to the quality or any characteristics of the property or any of its component parts, or as to the condition of the property, its merchantability or fitness for any particular purpose. Lessee hereby accepts the property "as is" with all faults.

*Date Equipment is Accepted: 2/17/75

LaConner Food Center
(Lessee's Trade, Corporate
or Firm Name)

By: s/ James S. Grobschmit

*PLEASE DATE THIS LETTER ON THE DATE YOU ACCEPT THE EQUIPMENT YOU ARE LEASING. DO NOT EXECUTE THIS FORM UNTIL YOU HAVE POSSESSION OF THE EQUIPMENT AND IT IS SATISFACTORY TO YOU.

The trial judge held that the signing of this equipment acceptance notice by Grobschmit did not constitute an unqualified acceptance by him of this particular merchandise from Tyler Reco, nor did it constitute a waiver as to Tyler Reco of any remedies that he still had available to him. Alternatively, the court reasoned that in the event it did constitute an acceptance from Tyler Reco, such acceptance on his part was, in fact, induced by Tyler Reco's assurances that the machine as of the date of signing of the acceptance had been remedied to conform with what everyone intended originally it should be, that is, an ice vending machine. In fact, the court found that it didn't conform to warranties of fitness, and in August 1976, although not using the language of the Uniform Commercial Code, Grobschmit revoked his prior acceptance of this machine, if in fact he had ever accepted it. (Findings of fact Nos. 6, 7, 9 and 3; conclusion of law No. 3.)

■■ Our appellate courts have given us guidelines as to when products are accepted and when such acceptance may be revoked under the Uniform Commercial Code.

In *Cervitor Kitchens, Inc. v. Chapman,* 82 Wn.2d 673, 513 P.2d 25 (1973), our Supreme Court held that installation of four kitchen units by a buyer into a building project following an opportunity to inspect is an act inconsistent with the seller's ownership of goods for the purpose of RCW 62A.2–606 and prevents rescission by the buyer.

Justice Utter, speaking for the court, stated at 676–78:

The issue for determination in this case is whether Chapman must be deemed to have accepted the units, either due to his failure to inspect and reject them for a period of approximately three months after delivery, or due to his installation of the units without prior inspection and rejection. We hold under the facts of this case, acceptance took place by Chapman's installation and cannot agree with the Court of Appeals that, as a matter

of law, the 3–month time delay in failing to inspect and accept or reject the goods constituted an acceptance.

**The Uniform Commercial Code, RCW 62A.2–606, went into effect on July 1, 1967. Prior thereto the Uniform Sales Act, §§ 47–48, was in effect. RCW 63.04.480, 63.04.490. Under both acts, the buyer was given a reasonable opportunity to examine goods delivered for the purpose of ascertaining whether they were in conformity with the contract. RCW 63.04.480, 62A.2–606. Furthermore, under both acts, the buyer, if he did any act in relation to the goods inconsistent with the seller's ownership, was deemed to have accepted the goods so as to become liable for the price. RCW 63.04.490, 62A.2–606. Such acceptance under both the Uniform Sales Act and under the Uniform Commercial Code did not bar an action for damages for breach of any promise or warranty. RCW 63.04.500, 62A.2–714, 62A.2–715. *See generally* 3 S. Williston, *Sales of Goods* §§ 470, 476, 483, 484 (rev. ed. 1948); R. Nordstrom, *Law of Sales* §§ 142, 150, 156 (1970).**

**[I]nstallation without inspection after over 3 months of delay—the deficiencies claimed being readily apparent upon inspection after the units were taken from the crates and before installation—is inconsistent with the seller's ownership as a matter of law. This conclusion is consistent with the rationale followed in installation cases. In *United States v. Crawford,* 443 F.2d 611 (5th Cir. 1971), a government contractor received and installed in place on a navy base several fuel filter/separator units. The court held the installation "inconsistent with the seller's ownership" within the meaning of Georgia's Code, U.C.C. § 2–606(1)(c). The buyer, accordingly, was precluded from revoking the purchase. In *Park County Implement Co. v. Craig,* 397 P.2d 800 (Wyo. 1964), the court held that the buyers of a truck chassis and cab accepted them "when they began installing a hoist and dump bed on the vehicle." Such an act was held inconsistent with the seller's ownership. The buyer, accordingly, was required to pay the contract price for the goods accepted under §§ 2–606(1)(c) and 2–607(1) of the Wyoming Uniform Commercial Code.**

. . .

We can agree with most of the statements of the Court of Appeals regarding the law on the issue of what was a

reasonable time for inspection of the units after delivery. Our only point of disagreement is with the application of that law to this case and their interpretation of the holding in *Pacific Commercial Co. v. Greer,* 129 Cal. App. 751, 19 P.2d 543 (1933). As we read that case, we believe it stands primarily for the proposition that retention beyond a reasonable time for examination and communication with the seller, standing alone, will be regarded as warranting the conclusion that the buyer has accepted the goods and become liable. In *Pacific Commercial,* goods were shipped in a time period from August 1, 1918 to August 9, 1919 and not rejected until November 1920. It is in that context the court held that to provide an excuse for what would otherwise be unreasonable delay in inspecting goods sold and delivered, prior inspection must be wholly impracticable.

In *Allis–Chalmers Corp. v. Sygitowicz,* 18 Wn. App. 658, 571 P.2d 224 (1977), Sygitowicz signed a retail installment contract with Northwest Roads for the purchase of a new Allis–Chalmers crawler tractor. The deferred payment price, including down payment, was $69,000.95. The vendor immediately sold the financing papers to Allis–Chalmers Credit Corporation. Within a week after purchase, Sygitowicz complained to the seller about the tractor's excessive consumption of oil. He continued to make payments through July 1972, however, and used the tractor through that summer. In October 1972, with several payments past due, Sygitowicz voluntarily returned the tractor to Northwest Roads. On November 21, 1972, Allis–Chalmers Credit Corporation mailed Sygitowicz a notice of resale, and on March 20, 1973, the tractor was sold at auction for $30,000. Allis–Chalmers then brought an action to recover a deficiency balance of $18,496.86 plus interest, allegedly due after default on the installment contract. The jury found for the defendant Sygitowicz, and Allis–Chalmers appealed.

Allis–Chalmers assigned error to the consideration at trial of the issue of revocation of acceptance. It argued (1) that revocation of acceptance must be pleaded, and (2) that Sygitowicz did not rightfully revoke his acceptance in accordance with RCW 62A.2–606. The court, in ruling

against the vendee and setting aside the verdict, stated at pages 660–62:

Revocation of acceptance is therefore an affirmative defense which must be set forth in the pleadings. Sygitowicz' answer and counterclaim specifies as affirmative defenses breach of warranties and failure to give proper notice of sale, but no mention is made of revocation of acceptance. The record does not include any notice of a trial amendment. Allis–Chalmers' objections to the introduction of evidence on the question of revocation of acceptance, therefore, should have been sustained as a matter of law. While the affirmative defense requirement is not to be construed absolutely, *Mahoney v. Tingley,* 85 Wn.2d 95, 529 P.2d 1068 (1975), it will not be abrogated where it affects the substantial rights of the parties. *Farmers Ins. Co. v. Miller,* 87 Wn.2d 70, 549 P.2d 9 (1976). We recognize that under CR 15(b) testimony received without objection has the effect of amending the pleadings to conform to the proof, but here the record reveals that Allis–Chalmers did object at every opportunity and that Sygitowicz made no motion to amend his pleadings. The defense of revocation of acceptance was therefore waived, and should not have been considered at trial.

Further, the record does not support a finding that acceptance was effectively revoked. RCW 62A.2–608 provides:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non–conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non–conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

548

Of controlling importance here are the requirements that the nonconformity substantially impair the value of the goods and that the buyer notify the seller of his revocation.

Sygitowicz asserts that the increased cost of operation due to excessive oil consumption substantially impaired the tractor's value. The court, however, must look to the effect of the impairment on the productivity of the use. Sygitowicz' extensive use of the tractor during the 13 months he retained it in his possession, absent a showing that such use was not normally productive negates a showing of substantial impairment. *See Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.,* 428 F. Supp. 364 (E.D. Mich. (1977)).

Sygitowicz contends that acceptance was effectively revoked when Northwest Roads was notified of the oil consumption problem a few days after the purchase date. We disagree; notice of breach is not equivalent to notice of revocation of acceptance. While the latter need not be in any particular form and may be implied by conduct, it must inform the seller that the buyer does not wish to keep the goods. *Hays Merchandise Inc. v. Dewey,* 78 Wn.2d 343, 474 P.2d 270 (1970); *Fenton v. Contemporary Dev. Co.,* 12 Wn. App. 345, 529 P.2d 883 (1974). Although Sygitowicz was aware of the oil consumption problem from the day the tractor was first put into use, he gave no indication of an intent not to keep the tractor until he delivered it back to Northwest Roads in October 1972. While such delivery might constitute revocation implied by conduct, the answer and counterclaim filed in the action affirmatively show that Sygitowicz' concern was breach of warranty and damages for such breach. Accordingly, his recovery was limited to that provided under RCW 62A.2–714 and RCW 62A.2–715, and his defense of revocation of acceptance was ineffective.

Following the guidelines as set forth in *Cervitor Kitchens, Inc. v. Chapman, supra,* and *Allis–Chalmers Corp. v. Sygitowicz, supra,* we must examine the evidence and review the court's findings to determine whether the defendants' acceptance was for the benefit of Tyler Reco, and whether defendants could revoke such acceptance. Necessarily in making our decision, these questions must be answered:

1. Did defendants, on accepting the ice machine, believe that defects would be cured?

2. Was acceptance induced by the difficulty of discovery of such defects or by assurances of Tyler Reco?

3. Did revocation of acceptance occur within a reasonable time and before any substantial change in condition of the goods?

The trial court, in the subject case, made the following findings of fact and conclusions of law:

Finding of fact No. 9:

In February of 1975, TYLER RECO made substantial repairs on the ice vending machine and assured GROBSCHMIT that the machine was then in proper operating condition; that in fact such was not the case; as late in August, 1975, TYLER RECO acknowledged that the machine was not operating properly and had a manufacturer's representative examine the machine. TYLER RECO and this person assured GROBSCHMIT that the defects would be corrected, but in fact nothing further was ever done to said machine.

Finding of fact No. 10:

On February 17, 1975, in reliance upon the assurances given by TYLER RECO, GROBSCHMIT signed and delivered to plaintiff an equipment acceptance notice accepting the equipment. The sole purpose of executing the equipment acceptance notice was solely to satisfy WORLD WIDE LEASE, INC., that WORLD WIDE LEASE, INC., had complied with its obligation. The execution of the equipment acceptance notice did not constitute acceptance of the machine from the standpoint of TYLER RECO. Based upon the representations of TYLER RECO, GROBSCHMIT had a right to assume that the defects would and could be corrected.

Finding of fact No. 12:

If the actions of GROSBSCHMIT and the use of the equipment constituted acceptance of the equipment with reference to TYLER RECO, such acceptance was induced by TYLER RECO's assurances that the machine did or would conform. Thereafter, it was determined that the machine did not conform and the Defendant, GROBSCHMIT, revoked any prior acceptance.

Conclusion of law No. 5:

That the Defendants, GROBSCHMIT, by executing the equipment acceptance notice was not accepting said machine with reference to its rights against TYLER RECO. In the alternative, if said actions constituted an acceptance, said acceptance was induced by the assurances of TYLER RECO and when it became apparent that TYLER RECO would not or could not make the ice vending machine conform, the Defendants, GROBSCHMIT, revoked their prior acceptance.

A review of the record shows the trial court's findings of fact and conclusions of law that "the acceptance of the goods had been induced by the assurances of Tyler Reco that the ice vending machine could be operative," cannot be sustained.

The fact is that defendants continually used the machine for a period of 22 months, right up to the time of the trial, from May 26, 1974, through March 1976, and admittedly it was 80 percent operable during that period.

There is a void of evidence from which the court could find that in February 1975, Tyler Reco assured Grobschmit that the machine was then in proper operating condition. Nor is there any evidence to support that portion of the finding that "as late as August 1975 Tyler Reco assured Grobschmit that the defects of the machine would be corrected." In fact, the evidence was directly the opposite, as Tyler Reco's agent, Turner, advised Grobschmit not to accept the machine, as illustrated by the following testimony:

A [Grobschmit] It was obvious that I wouldn't accept a machine that was malfunctioning. Mr. Bud Turner who has in my estimation been my total right arm with Tyler Reco and my advisor, I would relate the problem to Bud and Bud would do whatever he could at that particular time to resolve the problem.

Q Did he ever advise you regarding acceptance of the ice machine?

A Yes.

Q *What advice did he give you?*
A *Don't accept it.*

(Italics ours.)

Turner's testimony corroborates Grobschmit's admission:

Q Prior to that time, March or April of 1975, did you ever advise Mr. Grobschmit not to accept that ice vending machine?
A [Turner] Yes.
Q And what did you specifically, do you recall what you told him?
A *I told him not to sign the paper work on it until he was satisfied it was working properly.*

(Italics ours.) Clearly it is undisputed that in executing the equipment acceptance notice, Grobschmit did not in any way rely upon Tyler Reco.

After repeated advice not to accept the machine by the representative of Tyler Reco until he was satisfied with it, and after 7 months of assorted problems, Grobschmit accepted the machine in the most unequivocal language. We hasten to again point out that on the equipment acceptance notice is the following language:

> We understand that you, as Lessor, make no representations or warranties either expressed or implied as to the quality or any characteristics of the property or any of its component parts, or as to the condition of the property, its merchantability or fitness for any particular purpose. Lessee hereby accepts the property "as is" with all faults.
> . . .
> PLEASE DATE THIS LETTER ON THE DATE YOU ACCEPT THE EQUIPMENT YOU ARE LEASING. DO NOT EXECUTE THIS FORM UNTIL YOU HAVE POSSESSION OF THE EQUIPMENT AND IT IS SATISFACTORY TO YOU.

Grobschmit testified that the representative of World Wide Leasing, Inc., had tried to have the acceptance signed many times previously but he had refused to do so because the machine was unsatisfactory. However, during the latter part of January 1975, the manufacturer had installed a new conveyor belt at its expense which apparently made the conveyor belt operable. Grobschmit advised the representative of the leasing company that if it worked for 2 weeks, he

would sign the acceptance, and apparently it did, for he then signed it. He then waited another 6 months (until another boating season had ended around Labor Day 1975) before he called the leasing company and told them to take the machine back. By that time the manufacturer was out of business and any rights that Tyler Reco mights have had against the manufacturer were foreclosed.

We hold that defendant Grobschmit, by signing the equipment acceptance notice wherein he acknowledged the machine was operative and had no defects, was accepting the machine "as is" and, by signing, the defendants released the distributor and seller, Tyler Reco. We further hold as a matter of law that Grobschmit's use of the ice vending machine for a period of 22 months with full knowledge of its operational disabilities is an unreasonable time and defendants are prohibited from revoking their previous acceptance of such machine.

The trial court's findings of fact Nos. 9, 10 and 12 are contrary to the evidence and must be set aside.

It is interesting to note that on June 6, 1975, approximately a month after the acceptance, it was testified that the machine was damaged by vandalism. The damage was described as "one coin changer was broken, and the whole box was bent." It may well have been that all the subsequent inoperability of the machine following the acceptance of the machine was caused by independent acts of third parties by reason of vandalism. Mr. Lawler, a representative of Tyler Reco, testified:

A [Lawler] Now, June 6, 1975, on June 6 I had to check out some relays in the machine, in the coin changer. Then on August 4 I had them install a couple of shelves. I got some new shelving that was sent, and I installed a couple of shelves on it, and then on August 21, 1975 I removed a coin slot. *Oh, yeah, that was when the machine was broken into. There was some vandalism, and that was the relays, too, by the way.* Like, for instance, the dates of, well, probably from June 6, 1975, June 13, and August 4 and August 21, there was, they had some vandalism. I guess some kids

broke into the coin boxes, so I had to go out, and I had to try to get the thing going. *One coin changer was broken, and the whole box was bent. . . .*

Q Would Mr. Grobschmit have been there on those occasions?

A Yes, he was, because he told me that, you know, it was broken into.

Q Were there complaints of any other problems with the machines made on those visits?

A I don't understand.

Q Were there any other complaints other than the vandalism complaint?

A No, no, the only problem that there was was the vandalism. *The machine wasn't working due to the vandalism in the coin box.*

Q Okay. What about the August 21 visit? What was the purpose of that?

A That's when I wrapped it up, and I installed these new coin changers that I ordered that came in, and August 21 is when I installed the coin changers.

Q *Coin changers, damaged because of the vandalism?*

A *That's correct.*

(Italics ours.)

A careful reading of the record fails to disclose what is meant by "the entire box was bent." It may well be that the trouble subsequent to the acceptance of the machine in May 1975 was caused by the bending of the machine. If the inoperability of the machine was caused by vandalism, we certainly cannot hold Tyler Reco responsible.

The record also shows that any assurances of the operability of the machine were not made by the representative of Tyler Reco, but rather by the manufacturer Schurtz:

Q And when did that occur?

A [Grobschmit] I would say sometime in September.

Q Okay, and what was the result of that conference?

A Mr. Johnston, who had purchased the Schurtz Company, assured us, meaning Bud Turner and I, that he clearly could see the problem, that he would go back and modify this, and with a modified mechanism speeding it up, the revolutions of the chain would resolve most of the problem, and that he would contact us within two to three weeks.

The above colloquy makes it apparent that the assurance given on that occasion was by the manufacturer only and not Tyler Reco. There is no testimony whatever of any assurances given by Tyler Reco.

## CONCLUSION

Undoubtedly timely action by defendant Grobschmit following the advice given by Tyler Reco not to accept the machine would have relieved Grobschmit of all liability to World Wide Lease, Inc.

We hold that the defendants unequivocally signed the equipment acceptance notice waiving all warranties, expressed or implied, as to not only the plaintiff lessor but Tyler Reco, the seller and distributor, as well. We further hold the defendants waited an unreasonable length of time before attempting to revoke their acceptance, and as a matter of law such revocation is prohibited.

The defendants' judgment against the cross defendant Tyler Reco is set aside in its entirety.

As the Tyler Reco judgment is being set aside, there is no need to consider the defendants' other assignment of errors.

Judgment against Tyler Reco reversed.

FARRIS, C.J., and CALLOW, J., concur.

Reconsideration denied December 20, 1978.

Review denied by Supreme Court March 16, 1979.